UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| MAINOR CELINE AVILEZ-CANALES, | ) | |
|---|---|---|
| Petitioner, | ) | |
| v. | ) | No. 3:22-CV-008-RLJ-JEM |
| JASON CLENDENION, | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Petitioner Mainor Celine Avilez-Canales is a prisoner proceeding pro se in a federal habeas action brought pursuant to 28 U.S.C. § 2254 in which he seeks to challenge the legality of his confinement under a Sevier County, Tennessee judgment of conviction for aggravated sexual battery [Doc. 1]. Having considered the submissions of the parties, the State-court record, and the law applicable to Petitioner's claims, the Court finds that the petition should be denied.

I. **SUMMARY OF EVIDENCE & PROCEDURAL HISTORY**

The victim and her friend, Angelica Buckner, went to a bar for drinks shortly after 9 p.m. on January 31, 2014, where they were approached at the bar by Petitioner and his friend [Doc. 12-2 p. 108-09; Doc. 12-3 p. 58-60]. The victim and Petitioner drank and danced together [Doc. 12-2 p. 26-27, 104-05; Doc. 12-3 p. 60-62]. Ms. Buckner testified that Petitioner was "handsy" with both her and the victim, and that she and the victim repeatedly told him to leave them alone [Doc. 12-2 p. 109]. Eventually, Ms. Bucker used "very inappropriate language" to dissuade Petitioner's advances by telling Petitioner, "We do not f*** Mexicans" [*Id*.].

Later in the evening, the victim went outside to smoke, and Petitioner followed her [Doc. 12-3 p. 62]. The victim testified that she turned down Petitioner's repeated sexual advances by

stating, "No, because you're nothing more than a dirty f***ing Mexican" [*Id*. at 65-66]. Assuming Petitioner would then leave her alone, the victim turned her head, felt something painful on the right side of her head, and remembers the "cherry" of her cigarette getting knocked partially into her mouth [*Id*. at 66, 74]. The victim, whose lips were burned in two places, was unsure if Petitioner hit her directly or with an object [*Id*. at 66-67, 74]. After that, the victim begged to be left alone, apologized, and offered to pay Petitioner for the drinks [*Id*. at 67].

The victim was severely intoxicated at the time of the incident and could not recall the particulars of the events that followed [*Id*. at 70-71]. Her final recollection was lying on her back with Petitioner above her [*Id*. at 67]. At trial, the victim testified that she did not unzip or unbutton her pants, pull up her shirt, or consent to intercourse with Petitioner [*Id*. at 67-68].

Raymond Stupplebeen was outside of the bar smoking when he saw the victim and Petitioner behind the restaurant next door "circling each other" and testified that, although it looked like they were dancing, "The body language wasn't right" [*Id.* at 42, 44-45]. At one point, Mr. Stupplebeen saw the victim fall down and Petitioner stand over the victim [*Id*. at 44-45]. Rebecca Kirby, who worked in the bar's kitchen, saw the victim and Petitioner behind the restaurant next door [*Id*. at 17, 18-19]. Ms. Kirby stated that Petitioner and the victim "looked like they were making out" [*Id*. at 19]. She testified that the victim fell three or four times, at which point she would hold her arms up and Petitioner would pick her up [*Id*. at 19-20]. Dakota Johnson, who worked as a bar-back, observed Petitioner and the victim behind the air conditioning unit of the restaurant and testified that "it looked like he had her pinned up against the wall, and she was kind of trying to get away from him" [Doc. 12-2 p. 75, 77]. Dylan Owens, the kitchen manager at the bar, testified that he was outside for thirty to forty-five minutes during the incident and heard

"shuffling" and possible raised voices; however, the sound was not entirely clear to him [ *Id.* at 89, 95-96].

Several witnesses saw Petitioner carry or drag the victim, who was beaten and semi-conscious, through the parking lot. Mr. Owens testified that the victim appeared intoxicated and "barely" able to walk [*Id*. at 90-91]. Mr. Stupplebeen testified that the victim's pants were down slightly, her feet limp, and her face hidden [Doc. 12-3 p. 45-47]. Both Mr. Stupplebeen and Ms. Kirby testified that it appeared as though Petitioner was trying to hide the victim's face as they approached Petitioner in the parking lot [*Id*. at 32, 47]. When several witnesses shouted for Petitioner to let the victim go, Mr. Stupplebeen noted that Petitioner dropped the victim to the ground "hard" [*Id*. at 48]. As Mr. Stupplebeen approached, Ms. Kirby observed that the victim held her arms out to him "almost like a 'help me' kind of thing" [*Id*. at 26-27]. Mr. Johnson testified that Petitioner explained that the victim's injuries occurred as the result of a fall [Doc. 12-2 p. 77]. Mr. Stupplebeen unsuccessfully tried to stop Petitioner from leaving the scene and called 911 as he asked others to follow Petitioner [Doc. 12-3 p. 48-49]. Jesse Parker, a bouncer at the bar who was on the outdoor patio when the victim was found, noted that as Petitioner passed him on the way back into the bar, "he patted [Mr. Parker] on the shoulder and winked at [him]. [Doc. 12-2 p. 63-64, 66]. Mr. Parker stated he "thought it was very odd" [*Id*. at 66].

Several witnesses observed the victim's condition, but none of the testifying witnesses directly saw how the victim became injured. Mr. Stupplebeen noted that the victim had "road burns or beat marks" on her face, was missing a shoe, and was unable to move on her own [Doc. 12-3 p. 47-48, 50]. Mr. Johnson observed that the victim's "face was — it was bad. She didn't fall." [*Id*. at 78]. Mr. Owens testified that the victim was missing a shoe, her pants were unfastened, there was debris and gravel in her hair and on her arms, and that she appeared to be "beaten up,"

3

as she had visible red marks, scratches, and bruises [Doc. 12-2 p. 90-91]. Ms. Kirby noted that the victim's face was "messed up," her clothes "askew," she was missing shoes and a jacket, her pants were undone, and her shirt was unbuttoned [Doc. 12-3 p. 22-23]. Mr. Parker observed that the victim was "visibly beaten," partially undressed, bleeding, and hysterical [Doc. 12-2 p. 67-68]. The victim repeatedly asked for "Angel," Ms. Bucker's nickname, and was still asking for her when Ms. Buckner arrived outside prior to the ambulance's arrival [Doc. 12-2 p. 113-14; Doc. 12-3 p. 23].

Bradley Holt, a paramedic who arrived on the scene that evening, found the victim unresponsive with a "pumpknot" on her face, other abrasions and lacerations to her face, a bruised torso, other bruises forming in her upper extremities, and a bleeding nose [Doc. 12-2 p. 52-53, 56-57]. The victim did not respond to speech, touch, or painful stimulation and was transported to the hospital in emergency status [*Id*. at 57-58]. Mr. Holt testified that he would have intubated her but for the fact that he did not have access to the appropriate paralytic medication [*Id*. at 57]. Along with concurring with the general state of the victim's condition described by the witnesses, Cecilia Miller, another paramedic who drove the ambulance, noted that she would have recommended a helicopter transport for the victim had one been available that night [*Id*. at 124-126]. Mr. Holt and Ms. Miller both insisted that the victim's injuries were inconsistent with a fall [*Id*. at 60, 127]. Officer Dan Wilder escorted the ambulance to the hospital "under emergency traffic," with his sirens and lights activated [*Id*. at 45].

A sexual assault nurse examiner, Misty Stamm, identified at trial a diagram she created of the victim's injuries, which included multiple facial abrasions; swelling and redness to the face; injuries to the right knee, left foot, left shoulder, leg, left elbow, coccyx, and left forearm; and tears on the victim's labia minora with "a small amount of active bleeding" [*Id*. at 141-42]. Ms. Stamm

4

testified that she had only observed such injury to the labia minora consistent with sexual assault — likely penetration — however, she acknowledged that the tears possibly could be the result of a consensual sexual act [Doc. 12-2 at 144-45; Doc. 12-3 p. 5-6]. She testified that even though the victim had a catheter at the hospital, she had never seen a catheter cause the type of tear the victim sustained [Doc. 12-2 p. 144].

In rebuttal to Ms. Stamm's testimony, the defense presented the testimony of Tracy Sisto, a licensed registered nurse who practiced nursing between 1982 and 2001, but who had continued to maintain her license status even after she stopped practicing nursing [Doc. 12-4 p. 9-10]. Ms. Sisto testified that catheterization can cause labial tears and irritation such as the victim experienced [*Id*. at 10-11].

The victim also testified at trial. She stated that when she awoke in the hospital the morning following the incident, she was in a neck brace, her whole body hurt, she felt interior and exterior vaginal pain, and she had trouble urinating for a few days due to the pain [Doc. 12-3 p. 70-71]. The victim noted that she had previously used a catheter in connection with giving birth that did not cause the pain or irritation that she felt after she awoke in the hospital on this occasion [*Id*. at 90]. She further testified that none of her injuries or pain existed prior to the incident in question [*Id*. at 68-69, 70-71]. The victim acknowledged having a long-term boyfriend at the time of the incident but asserted that she was not fabricating an assault to protect that relationship [*Id*. at 81, 88-90].

When Petitioner was apprehended, he admitted to Detective Bush that he bought the victim a drink, followed her to the patio, walked over to the restaurant with her with the intent to have sexual intercourse, and unzipped her pants [*Id.* at106]. However, he denied having intercourse with her and insisted that she fell on the concrete, hitting her face [*Id.* at 105].

5

At trial, Petitioner testified that the victim asked him to have sex three times, that they intended to have sex, but that those plans were derailed when the victim fell [*Id*. at 124-126]. Petitioner testified at trial that he did not unzip the victim's pants [*Id*. at 132]. Petitioner also stated that accepting a drink "could be" consent to sexual intercourse [*Id*. at 142].

Although a Sevier County grand jury indicted Petitioner for one count of aggravated rape [Doc. 12-1 8-9, 68], Petitioner was ultimately convicted of the lesser-included offense of aggravated sexual battery following his jury trial [Doc. 12-4 p. 58]. The trial court sentenced Petitioner to a twelve-year term of incarceration [Doc. 12-1 p. 68]. On direct appeal, the Tennessee Court of Criminal Appeals ("TCCA") affirmed. *State v. Canales*, No. E2017-01222-CCA-R3-CD, 2018 WL 2084957, at *9 (Tenn. Crim. App. May 4, 2018) ("*Canales I*").

Thereafter, Petitioner filed a pro se petition for post-conviction relief [Doc. 12-15 p. 4-6]. Following the appointment of post-conviction counsel, counsel filed an amended petition alleging the ineffective assistance of trial counsel [*Id*. at 7-8, 18-24]. The post-conviction court held an evidentiary hearing where William Lee Wheatley, Petitioner's retained trial and appellate counsel, testified [Doc. 12-16 p. 21-54]. Mr. Wheatley stated that he did not recall discussing with Petitioner the possibility of retaining a medical expert witness, but that he was aware of the victim's medical records and the sexual assault nurse examiner's report prior to trial [*Id*. at 24-27]. In response to the testimony of the sexual assault nurse examiner regarding the injury to the victim's labia minora, Mr. Wheatley recalled suggesting to the jury that the injury was the result of the catheterization the victim received in the hospital [*Id*. at 26].

Mr. Wheatley noted that he called Ms. Sisto to testify about any possible damage to the victim caused by using a catheter, and while he acknowledged that it was a late witness disclosure and that the trial court would not certify Ms. Sisto as an expert, he noted that she was nonetheless

6

allowed to testify from her knowledge and experience [*Id*. at 43-44]. Mr. Wheatley stated he did not perceive any other issue on which expert testimony was needed, and he noted that the sexual assault nurse examiner testified that the victim's injuries could have occurred from consensual sexual contact [*Id*. at 44].

Mr. Wheatley pointed out that Petitioner was not convicted of penetration, because the jury acquitted him of aggravated rape and only convicted him of the lesser-included offense of aggravated sexual battery [*Id*. at 26]. Mr. Wheatley recalled that his strategy was to argue to the jury that the victim's injuries were a result of falling due to heavy intoxication [*Id*. at 26-27].

Mr. Wheatley noted that he questioned the employees of the bar who testified that they saw the victim hugging Petitioner and dancing with him and was able to elicit testimony from the victim that she had a child and boyfriend at home [*Id*. at 28]. The witnesses who testified they saw the victim and Petitioner "making out" behind the restaurant stated that there was anywhere from twenty to forty-five minutes prior to the victim returning to the bar with injuries [*Id*. at 29-30]. Mr. Wheatley explained that no witnesses testified that the victim cried for help or that there were sounds of a struggle, and that the elicited testimony supported the defense theory that the victim went behind the restaurant consensually with the victim and later tripped, causing her injuries [*Id*. at 30].

After the TCCA issued its opinion on direct appeal, Mr. Wheatley sent a copy to Petitioner along with a letter informing Petitioner that if he wished to appeal, he had sixty days to do so [*Id*. at 31-32]. Mr. Wheatley noted that his assistant was a registered court interpreter, and that the assistant translated counsel's letter to Petitioner from English to Spanish [*Id*. at 35]. Both the Spanish and English versions of the letter were sent to Petitioner [*Id*.]. Thereafter, Petitioner twice requested his court file from Mr. Wheatley, and Mr. Wheatley sent Petitioner the file after receipt

7

of Petitioner's second letter [*Id*. at 32-33]. However, Petitioner never expressed a desire to appeal to the Tennessee Supreme Court, and Mr. Wheatley did not believe there was a basis to appeal [*Id*. at 33].

At the post-conviction hearing, Petitioner stated that he always spoke to Mr. Wheatley with the assistance of an interpreter, and that he did not understand American laws [*Id*. at 55-56]. Petitioner acknowledged receiving the letter from trial counsel regarding the appeal deadline but stated he did not understand what that might entail [*Id*. at 58-59]. Petitioner admitted that he never asked trial counsel about the process of appeal to the Tennessee Supreme Court [*Id*. at 59]. Rather, Petitioner stated that he believed post-conviction review to be the next step [*Id*.].

At the conclusion of proof and arguments, the post-conviction court denied relief [Doc. 12-15 p. 28-30]. The TCCA affirmed the decision of the post-conviction court. *Canales v. State*, No. E2020-01040-CCA-R3-PC, 2021 WL 3363454, at *1 (Tenn. Crim. App. Aug. 3, 2021) ("*Canales II*"). The Tennessee Supreme Court denied Petitioner permission to appeal on November 17, 2021 [Doc. 12-27].

On January 7, 2022, this Court received Petitioner's timely petition for a writ of habeas corpus under 28 U.S.C. § 2254, in which Petitioner raises three claims of ineffective assistance of trial counsel, and one claim challenging a jury instruction [Doc. 1]. Shortly after filing his § 2254 petition, Petitioner filed a petition for writ of certiorari in the United States Supreme Court that was denied on April 18, 2022. *Canales v. Tennessee*, No. 21-7194, 142 S. Ct. 1684 (2022).

After an initial review of the federal habeas petition, the Court ordered Respondent to file a response to the petition along with the State-court record [Doc. 3]. Respondent subsequently filed the State-court record [Doc. 12] and an answer to the petition [Doc. 13]. Petitioner sought and obtained an extension of time within which to file a reply to Respondent's answer [Docs. 16

and 17] and submitted his reply on August 19, 2022 [Doc. 18]. Accordingly, this matter is ripe for review.

## II. LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in a State court unless that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *Williams*, 529 U.S. at 407-08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold."); *Williams*, 529 U.S. at 410-11. This standard will allow relief on a federal claim decided on its merits in State court only where the petitioner demonstrates that the State ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility

9

for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). When evaluating the evidence presented in State court, a federal habeas court presumes the correctness of the State-court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The doctrine of procedural default also limits federal habeas review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available State remedies, and the State court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a State court clearly and expressly bases its dismissal of a claim on a State procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 731-32, 735 n.1 (1991). A procedural default may be circumvented, allowing federal habeas review of the claim, only where the prisoner can show cause and actual prejudice for the default, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977). "Cause" is established where a petitioner can show that some objective external factor impeded defense counsel's ability to comply with the State's procedural rules, or that his trial counsel rendered ineffective assistance. *Coleman*, 501 U.S. at 753-54. Additionally, the prejudice demonstrated to overcome the default must be actual, not merely a possibility of prejudice. *See Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986) (citations omitted); *see also United States v. Frady*, 456 U.S. 152, 170 (1982) (holding prejudice showing requires petitioner to bear "the burden of showing, not merely that errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with

10

error of constitutional dimensions") (emphasis in original). A fundamental miscarriage of justice occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

## III. ANALYSIS

### A. Ineffective Assistance of Counsel

Petitioner alleges that trial counsel rendered ineffective assistance by failing to (1) identify, disclose, and call an expert witness, (2) file an application for permission to appeal to the Tennessee Supreme Court, and (3) raise in the motion for a new trial a claim that his jury instructions misstated an element of the offense [Doc. 1].

To establish the constitutionally ineffective assistance of counsel sufficient to warrant federal habeas corpus relief, a habeas petitioner must satisfy the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). That is, he must demonstrate (1) counsel's constitutionally deficient performance, and (2) actual prejudice as a result of such ineffective assistance. *Id.* at 687, 694. Deficiency is established when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687-88. A reviewing court's scrutiny is to be "highly deferential" of counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id.* at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id.*

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id.* at 694. However, an error, even if

11

professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id.* at 691.

On habeas review, the issue for the district court is not whether the *Strickland* standard is met, but rather, whether the State-court's decision that *Strickland* was not met warrants relief under AEDPA standards. *See Richter*, 562 U.S. at 105 ("When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). This creates a "doubly" deferential standard of review in federal habeas proceedings. *Id*. Accordingly, when a *Strickland* claim has been rejected on its merits by a State court, a petitioner "must demonstrate that it was necessarily unreasonable" for the State court to rule as it did in order to obtain federal habeas relief. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

    1.    **Expert Witness**

Petitioner claims that trial counsel was ineffective for failing to investigate, identify, disclose, and call an expert witness on his behalf [Doc. 1 p. 8]. Specifically, he maintains that Ms. Sisto was not timely disclosed, and thus, was not allowed to testify as an expert [*Id.*].

The TCCA rejected Petitioner's claim, noting that Petitioner's trial counsel presented evidence that use of a catheter could cause the victim's injuries through Ms. Sisto as a lay witness, and trial counsel elicited favorable testimony on the issue from Ms. Stamm on cross-examination. *Canales II*, 2021 WL 3363454, at *5. Moreover, the TCCA found that Petitioner did not present any uncalled witnesses at his post-conviction hearing, which precludes a finding of prejudice. *Id*.

The Court finds the TCCA's determinations reasonable under the AEDPA standards. Ms. Sisto was allowed to testify as a lay witness regarding her general knowledge and experience with catheters, and trial counsel elicited from Ms. Stamm that the victim's labial tear could have

12

possibly resulted from consensual sex [Doc. 12-4 p. 10-11; Doc. 12-3 p. 5-6]. Moreover, trial counsel noted that Petitioner was not convicted of a crime requiring sexual penetration, which trial counsel characterized as the State not carrying its burden of establishing penetration [Doc. 12-16 p. 26].

Further, Petitioner failed to present any expert testimony or additional witnesses at the post-conviction hearing who would have testified in his favor. When a petitioner makes a claim of ineffective assistance of counsel predicated upon a failure to present a fact, the petitioner must present "a sufficiently detailed and convincing account" of what the facts would have been. *See Welsh v. Lafler*, 444 F. App'x 844, 851 (6th Cir. 2011). It is not an unreasonable application of federal law to determine that a petitioner failed to prove prejudice on a claim regarding the failure to call an expert when he did not call the expert witness at the post-conviction hearing. *Pewitte v. Washburn*, No. 3:20-cv-0010, 2020 WL 7489460, at *14 (M.D. Tenn. Dec. 21, 2020). Therefore, under the doubly deferential standard of review, Petitioner cannot show prejudice under *Strickland*.

Accordingly, the Court finds that the rejection of this claim was not contrary to, nor was it an unreasonable application of, *Strickland* and its progeny, nor was it based on an unreasonable determination of facts in light of the evidence presented. Petitioner is not entitled to relief on this claim.

### 2. Appeal to the Tennessee Supreme Court

Petitioner next argues that trial counsel was ineffective for failing to file an application for permission to appeal to the Tennessee Supreme Court [Doc. 1 p. 10]. The TCCA determined that trial counsel was not deficient because he notified Petitioner of the time frame to seek permission

to appeal and Petitioner never requested that trial counsel seek further appellate review. *Canales II*, 2021 WL 3363454, at *6.

Petitioner acknowledges that he cannot demonstrate prejudice under *Strickland*, which precludes the grant of federal habeas relief as to this claim [Doc. 18 p. 24]. *See Strickland*, 466 U.S. at 697 ("A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the default as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. . . that course should be followed.").

The Court otherwise finds that the record establishes that trial counsel clearly communicated to Petitioner, in two languages, the necessary information concerning permission to appeal to the Tennessee Supreme Court, and Petitioner conceded that he did not ask counsel to pursue further appellate review [Doc. 12-16 p. 32-33, 35, 58-59, 63]. Accordingly, the Court finds that the decision rejecting this claim is not contrary to, nor is it an unreasonable application of, *Strickland* and its progeny, and it is not an unreasonable determination of the facts in light of the evidence presented to the court.

### 3. Jury Instruction Claim in Motion for a New Trial

In his third claim of ineffective assistance, Plaintiff alleges that his counsel performed ineffectively in failing to argue in Petitioner's motion for a new trial that Petitioner was denied the right to a correct and complete jury charge because the jury instructions misstated an element of the offense [Doc. 1 p. 5].

Petitioner has never presented this claim of ineffective assistance to the State courts. A claim must be presented to the TCCA in order to meet the AEDPA's exhaustion requirement. *See Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003); *see also* Tenn. S. Ct. R. 39 (establishing

14

Case 3:22-cv-00008-RLJ-JEM   Document 19   Filed 08/30/22   Page 14 of 20   PageID #: 1052

presentation of claim to TCCA is sufficient to exhaust State remedies). Therefore, by failing to pursue this claim to the TCCA, Petitioner failed to fully exhaust this claim. *See Boerckel*, 526 U.S. at 845 (holding that proper exhaustion requires petitioner to pursue claim through "one complete round of the State's established appellate review process"). Because there is no avenue by which Petitioner may now obtain State-court review of this claim, it is technically exhausted but procedurally defaulted by Tennessee's applicable statute of limitation and prohibition against successive petitions. *See Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted."); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule).

To the extent that Plaintiff argues that this procedural default should be excused due to trial counsel's failure to raise this jury instruction claim in a motion for a new trial, the Court must consider whether Plaintiff can demonstrate sufficient cause to overcome the default. In *Martinez v. Ryan*, the United States Supreme Court held that the ineffective assistance of post-conviction counsel may, under limited circumstances, qualify as cause to excuse the procedural default of ineffective-assistance-of-trial-counsel claims. *Martinez*, 566 U.S. 1, 16 (2012); *Sutton v. Carpenter*, 745 F.3d 787, 795-96 (6th Cir. 2014) (applying *Martinez* in Tennessee). To constitute "cause" to overcome a procedural default under *Martinez*, a petitioner must show that (1) he has a substantial claim of ineffective assistance of trial counsel; (2) counsel on initial State collateral review was nonexistent or ineffective; (3) the State collateral proceeding was the first occasion on which to raise a claim of ineffective assistance of trial counsel; and (4) State law requires that the ineffectiveness of trial counsel claim be raised for the first time during the State collateral proceeding. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013). An ineffectiveness claim is substantial

15

if the petitioner can demonstrate that it has "some merit." *Hill v. Mitchell*, 842 F.3d 910, 938 (6th Cir. 2016).

The claim underlying Petitioner's claim of ineffective assistance — the allegedly erroneous jury instruction issue — was deemed waived on direct appeal. *Canales I*, 2018 WL 2084957, at *6. Nonetheless, the trial court examined the issue for plain error and determined that the facts of this case rendered any error in the jury instructions harmless beyond a reasonable doubt. *Id*. at 7-8. Because Petitioner's underlying jury instruction claim was determined to be harmless beyond a reasonable doubt, Petitioner cannot show that but for trial counsel's actions the result of the proceedings would be different. That is, had trial counsel raised the claim in a motion for a new trial, the TCCA would have found on direct appeal any error in the instruction harmless beyond a reasonable doubt. Accordingly, Petitioner's claim is not substantial because he cannot demonstrate prejudice, and therefore, he is not entitled to application of the *Martinez* exception to overcome the procedural default of this claim.

### B. Jury Instruction

In Ground One, Petitioner claims that he was denied the right to a correct and complete jury charge because the jury instruction on aggravated sexual battery misstated an element of the offense, and thus, lessened the State's burden of proof [Doc. 1 p. 5]. Petitioner argues that the statutory definition of aggravated sexual battery requires an intentional touching, but that his jury, however, was instructed that he could be found guilty provided he "acted intentionally, knowingly, or recklessly" [Doc. 18 p. 13-14].

The Court notes that there is no general federal right to a properly instructed jury; jury instructions are ordinarily a state-law issue. *See Estelle v. McGuire*, 502 U.S. 62, 70-72 (1991). Generally, "a state court's interpretation of state law, including one announced on direct appeal of

the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). As such, errors in a state-court's jury instructions do not warrant federal habeas relief unless they deprive a petitioner of a fundamentally fair trial. *Estelle*, 502 U.S. at 72-73; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973) (holding error in instruction does not warrant reversal unless "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process").

The TCCA noted that in order to convict Petitioner of aggravated sexual battery, "the State had to demonstrate that the Defendant had unlawful sexual conduct with the victim and caused the victim bodily injury." *Canales I,* 2018 WL 2084957, at *7 (citing Tenn. Code Ann. § 39-13-504(a)(2)). It further noted that "[s]exual contact 'includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.'" *Id*. (citing Tenn. Code Ann. § 39-13-501(6)).

Petitioner's jury was instructed on the crime of aggravated sexual battery as follows, in relevant part:

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

> (1) that the defendant had intentional unlawful sexual contact with the alleged victim in which the defendant intentionally touched the alleged victim's intimate parts, or the clothing covering the immediate area of the alleged victim's intimate parts[;] that the alleged victim had intentional unlawful sexual contact with the defendant in which the victim intentionally touched the defendant's, or any other person's intimate parts, or the clothing covering the immediate area of the defendant's, or any other person's intimate parts; and
>
> (2) that the defendant caused bodily injury to the alleged victim; and
>
> (3) that the defendant acted intentionally, knowingly or recklessly.

17

> "Sexual contact" means the intentional touching of the alleged victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the alleged victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

[Doc. 12-1 p. 45-46].

Petitioner denied any sexual contact with the victim at trial, [Doc. 12-3 p. 132-33] but informed Detective Bush during an interview that he intentionally unzipped the victim's pants [Doc. 12-2 p. 28; Doc. 12-3 p. 106]. The Court finds, as the TCCA noted, that there was no evidence presented from which the jury could have concluded that Petitioner had knowingly or recklessly touched the victim, as all of the evidence established that Petitioner's touching of the victim's intimate parts was intentional. *See Canales I*, 2018 WL 2084957, at *8. Therefore, even if there was ambiguity in the instruction, it did not by itself have a constitutionally injurious effect on the fundamental fairness of the trial. *See Cupp*, 414 U.S. 141 at 147.

Moreover, even assuming that this State-law claim is cognizable in these proceedings, it is procedurally defaulted. The TCCA held that Petitioner waived this issue by failing to raise the issue in a motion for a new trial. *Canales I,* 2018 WL 2084957, at *6. The TCCA enforced and unambiguously relied on Tennessee Rule of Appellate Procedure 3(e), which requires presentation of a claim in the motion for a new trial before it may be raised on appeal. *Id.* This is an adequate and independent state law ground for denying review. *See Moutry v. Mays*, No. 3:19-cv-266, 2019 WL 6255852, at *6-7 (E.D. Tenn. Nov. 22, 2019) (citing cases). The plain error analysis does not overcome the procedural default's application. *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) (citing *Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000)). Therefore, this claim is otherwise procedurally defaulted.

Petitioner appears to argue that his procedural default of this claim may be excused due to the error of post-conviction counsel [Doc. 1 p. 12]. However, *Martinez* is applicable only to claims of counsel's ineffectiveness at trial. *Atkins v. Holloway*, 792 F.3d 654, 662 (6th Cir. 2015). There is no constitutional right to counsel in a state post-conviction proceeding, and therefore, the ineffective assistance of post-conviction counsel cannot constitute cause. *See, e.g., Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (declining to extend *Martinez* to substantial, defaulted claims of ineffective appellate counsel); *Coleman*, 501 U.S. at 752 (providing that "[t]here is no constitutional right to an attorney in state post-conviction proceedings" and that, therefore, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings") (citations omitted). Thus, *Martinez* is not applicable to this claim, and any claim for ineffective assistance of post-conviction counsel is not cognizable in this action.

## IV. CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the

district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying this standard, the Court concludes that a COA should be denied in this case.

V. **CONCLUSION**

Petitioner has failed to demonstrate an entitlement to federal habeas relief. Therefore, his petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

Finally, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

ENTER:

s/ Leon Jordan
United States District Judge